## ANDREW BOYD *vs.* MARY DOWIE, FREDERICK KITTLE and HENRY UTTER.

There was no compulsory process, by the common law, to effect a partition of real estate; and no compulsory partition can be made under our statutes, unless the owners are in possession of the land as joint tenants, or as tenants in common.

If the parties are not in possession of any portion of the land described in the complaint, either as joint tenants or tenants in common, an action for the partition of such lands cannot be maintained.

But where the complaint, after a prayer for a partition, contained a general prayer for "such other and further relief as to the court shall seem just and proper," and there was an answer put in; *held* that the prayer was sufficient to uphold any judgment to which the plaintiff might be entitled, upon the evidence, consistent with the case made by the complaint and embraced within the issue.

Since the adoption of the constitution of 1846 and the passage of the judiciary act of 1847, an action can be maintained in the Supreme Court, as a court of equity, in cases where a like suit in equity could be sustained in England.

An action in equity will lie to ascertain and fix the boundary lines between the lands of the parties, whenever there are peculiar equities attaching themselves to the controversy; or when it will prevent a multiplicity of suits.

Where each party to the action was owner, in fee, of one-fourth part of over 1,200 acres of land, of an uneven and hilly surface, and mostly wild and covered with timber; and the boundary or division lines between the several owners had never been ascertained or fixed by any accurate survey, nor had corners been set, or monuments erected, or trees been marked to designate either of the corners or lines of the land of either party; neither party could, with the aid of a surveyor, ascertain with reasonable accuracy, except by chance, the boundary or division lines between his land and that of the other parties; and the boundary lines of no one of the parties could be determined and fixed without ascertaining the location of the boundary lines, or some of them, of each of the other parties; *held* that these boundary lines ought to be ascertained, fixed and designated, so that the parties would be bound by the locations thereof, and know where they were.

A confusion of boundaries of lands exists when, by the deeds thereof, or the acts of the owners or occupants, the boundaries cannot be ascertained with reasonable certainty by one party alone, or except by the judgment or opinions of men, after an examination of the deeds, and the premises, with a surveyor, aided, perhaps, by the examination of witnesses.

*Held* that within this rule, a confusion of boundaries had been shown in this case, although it had not happened through the fault of either party, but had arisen from the uncertain and confused descriptions of the lands, in deeds thereof, given in 1854, by the person under whom each party derived title

to his or her portion of the land. And that a case was established which would justify the appointment of commissioners to ascertain and fix the boundary lines between the several owners of the land in question.

THIS action was tried at an adjourned Special Term of the Supreme Court, in Delaware county, in November, 1872.

The complaint shows, substantially, that each party to the action is the owner in fee simple of one-fourth part of over 1,200 acres of land situated in the county of Delaware, known as "Solomon Green's Pisgah tract;" which land is described in the complaint. That each party obtained title to his or her share or interest in the land through several mesne conveyances from the aforesaid Solomon Green.

The conveyances mentioned in the complaint and the deeds given in evidence on the trial indicate in which quarter or part of the tract each party's land is situated. But the boundaries thereof must be irregular according to the descriptions in the deeds; and the boundaries around the whole tract of land are irregular.

The deed from Green, under which one of the parties, Mary Dowie, derives title to her part of the land, contains this statement, to wit: "Being one-fourth of the tract of land, known as Pisgah, being that portion which is occupied by Elias Halstead, the division line to run *on the top* of said Pisgah, so as to convey the one-fourth part which *breaks over* the mountain towards the farm formerly known as the William Winzie farm, said line to run between the land herein described and the farms which are now occupied by Aaron West, and another by Marcus Halstead, so as to divide the said farms *on the summit of the mountain,* or where the *water divides,* excepting about sixty acres heretofore sold to Mr. Worden, containing about 300 acres, be the same more or less."

The deed from Green, under which another party derives title to his part of the land, contains the following

Boyd *v.* Dowie.

language, to wit: "All that certain piece of land on which Charles Aithus now resides, * * * *to be laid out* of the lands now owned by the party of the first part, being and lying adjacent to the residence of the said Charles, and being what *properly* belongs to that division of the lands of the party of the first part owned in the towns of Andes, Boliva and Middletown, so as to divide equally and *justly* the lands so owned by me into four divisions, so that each division shall contain a *proper proportion* of what is now owned by the said party of the first part, * * * the lines to be so run as not to *encroach* on lands deeded to Currie, nor those now occupied by Aaron West and by Van Ness Halstead, and so as to include that *proportion* of Pisgah which *naturally* belongs to it, and to be minus one-fourth of a piece of land of about fifty acres conveyed to Ira Worden, * * * the original purchase being supposed to contain about 1,200 acres of land, one-fourth of which being about 300 acres of land, be the same more or less."

The deed from Green, under which another party derives title to his part of the land, contains the following statement, to wit: "Bounded by the *undivided* one-fourth of said about 1,200 acres, deeded to George Currie April 14, 1854, also by another one-fourth, yet *undivided*, of said about 1,200 acres deeded to John G. Aithus November 1, 1854; also, by another one-fourth, yet *undivided*, of said about 1,200 acres belonging to the said Solomon Green, as the several lines of the four quarters of the said about 1,200 acres, may *happen* to run *across Pisgah* so as to give to each one-fourth of said tract of about 1,200 acres an equal quantity of land, and *each* in as *compact* and as *well watered*, as convenient letting (if possible) each one-fourth of *about* 300 acres, *each corner on Pisgah*, in Delaware county."

The deed from Green, under which the other party (the plaintiff) derives his title to his part of the land,

contains these words, to wit: "The occupants of these farms *are to divide* the said tract of about 1,200 acres between them equally, so that by running their lines, *each may be accommodated in the best manner as to water, roads and wood to each place*, at their own expense." The same deed contains this clause, viz: "This tract of about 1,200 acres was originally bought by S. Green of Garrett Van Keuren, of Rhinebeck, and a corner of forty or fifty acres, which has been sold to Mr. Worden, is hereby reserved."

It is alleged in the complaint "that no division or partition of the said tract of land has ever been made, and that the boundary and division lines of the four quarters above described, and owned as aforesaid by the parties to this action, have never been ascertained or settled." Also, that the plaintiff "has heretofore requested and demanded of the above named defendants, that they unite with him in making partition and division of the said tract of land between them, according to their respective rights; but that they have neglected and refused to do so."

The demand for judgment, in the complaint, is "that the said lands be partitioned and divided between the respective owners thereof, according to their respective rights, by and under the direction of the court, by commissioners appointed by the court. That the division and boundary lines of each one-fourth so owned as above stated by the respective parties hereto be ascertained and determined by such commissioners, and that the plaintiff have such other and further relief as to the court shall seem just and proper, besides the costs of this action."

Other facts in the pleadings, or proved on the trial, are stated in the following opinion.

*William M. Murray*, for the plaintiff, referred to the following authorities: *Will. Eq. Jur.* 56; 4 *Kern.* 580;

Boyd *v.* Dowie.

2 *R. S.* 173, § 36 ; 1 *Van Santvoord's Eq. Pr. p.* 4, 2*d ed.;* 1 *Story's Eq. Jur.* §§ 609–620, 5*th ed.; Black. Com. by Chitty, vol.* 3, *p.* 330, *note "Boundaries, &c.;" Co. Lit., Butler & Hargrave's Notes, p.* 169, *a.*

*W. H. Johnson,* for the defendants, relied on 2 *R. S.* 317, § 1.)

BALCOM, J. There was no compulsory process by the common law to effect a partition of real estate. (1 *Wash. on Real Prop. p.* 560, 3*d ed.*) And no compulsory partition of real estate can be made under our statutes, unless the owners are in possession thereof "as joint tenants, or as tenants in common." (2 *R. S.* 317, § 1.)

The parties to this action are not in possession of any portion of the land described in the complaint, either as joint tenants or as tenants in common, and therefore this action cannot be maintained as one for the partition of such lands.

The plaintiff's counsel insists that the action is maintainable under the prayer in the complaint for "such other and further relief as to the court shall seem just and proper," on the ground that the pleadings and evidence show that there is a confusion of boundaries of the lands of the parties described in the complaint; and that the action will prevent a multiplicity of suits.

The prayer for relief is sufficient to uphold any judgment that the plaintiff may be entitled to upon the evidence, consistent with the case made by the complaint and embraced within the issue ; for there is an answer to the complaint. (*Code,* § 275.)

The plaintiff's counsel does not claim that there is any reported decision in this country showing that a suit in equity has been maintained by reason of a confusion of boundaries of the lands of the parties, to ascertain and fix such boundaries, and prevent a multiplicity

of suits.   It is therefore necessary to look to English precedents to support the action, if it .be maintainable.

Before the adoption of the constitution of 1846, the jurisdiction of our court of chancery was defined by stat-ute as follows, viz: " The powers and jurisdiction of the court of chancery are coextensive with the powers and jurisdiction of the court of chancery in England, with the exceptions, additions and limitations, ·created and imposed by the constitution and laws of this State." (2 *R. S.* 173, § 36.) That court was abolished by the constitution of 1846.   But the powers and jurisdiction it had possessed were conferred upon this court by the act in relation to the judiciary, passed in May, 1847.   (*Laws of* 1847, *vol.* 1, *p.* 323, § 16.)

It follows that this action can be maintained in this court, if a like suit in equity could be sustained in England.

Each party to the action resides on some portion of his quarter of the 1,200 acres of land described in the complaint.   The greater portion of each quarter of the land is wild, and covered with timber.   Nearly all of the whole tract is uneven and hilly.   "Mount Pisgah" is on it, which is the highest land in Delaware county. Each party has one or more buildings on the cleared portion of his or her quarter of the land.   The boundary or division lines between the lands of the parties have never been ascertained or fixed by any accurate survey ; nor have corners been set, or monuments been erected, or trees been marked, to designate either of the corners or lines of the land of either party.   Neither party can, with the aid of a surveyor, ascertain with reasonable accuracy, unless by chance, the boundary or division lines between his land and that of the other parties. And the boundary lines of no one of the parties can be determined and fixed without ascertaining the location of the boundary lines, or some of them, of each of the other parties.

The plaintiff has made some efforts to have the boundary lines of the lands of the parties ascertained, determined, fixed and designated, by the joint employment of a surveyor or other competent persons; but has failed to effect such an arrangement.

It is easy to see that the cutting of timber by the parties on or near where they may believe the boundary lines of their lands are or should be, might cause a multiplicity of suits. But no number of suits, if any, have been threatened by reason of the acts of the parties, or the acts of either of them, on the lands.

It is certain that these boundary lines ought to be ascertained, fixed and designated, so that the parties will be bound by the locations thereof, and know where they are.

Willard says: "The relief which equity affords in the case of confusion of boundaries, is referable to the head of accident. Where *lands* have become mixed or confounded without the fault of the plaintiff, equity will appoint a commission to settle the boundaries, and upon confirming the report, make a proper decree between the parties." (*Will. Eq. Jur.* 56.) The only authority cited by him is the decision of Lord Chancellor Hardwicke, made in 1744, in *Norris* v. *Le Neve*, (3 *Atk.* 82.) That was a case in which commissioners had been appointed to settle the boundaries between the parties, and for separating freehold and copyhold lands; and the question of jurisdiction was not mentioned by the lord chancellor. Hence it must be assumed it was a plain case of confusion of boundaries, in which the jurisdiction of the court was not questioned.

In *Wake* v. *Conyers*, (1 *Eden*, 331,) decided by Lord Keeper Henley in 1759, it was held that commissions to fix boundaries of legal estates, are not of course; that there ought to be some equitable circumstance for the court to lay hold of; also that all the cases, where the court has entertained bills for establishing boundaries,

Boyd *v.* Dowie.

have been where the soil itself was in question, or there might have been a multiplicity of suits. In that case the bill was to ascertain the boundaries of two manors; and it was dismissed, there being no dispute as to the soil. The lord keeper said that he was desirous that some precedent should be produced to show him that the court could entertain a bill of that nature to settle the boundaries of an incorporeal inheritance; but none such had been produced.

*Metcalfe* v. *Beckwith*, (2 *P. Wms.* 376,) decided in 1726, was a case in which a bill was filed to settle the boundaries of the manor of Dale, of which the plaintiff was lord, and of the manor of Sale, which belonged to the defendant, the plaintiff and defendant insisting upon different boundaries. A feigned issue was ordered, and after three verdicts in favor of the defendant, the master of the rolls said : "The objection, that this bill was in the nature of a bill of partition, seems to be of some weight; but as the defendant has no bill here, and the plaintiff might have tried this matter at law, and more especially since no part of the issue is found for the plaintiff, who is in the wrong *in toto*, why should he not be within the common rule, and pay costs throughout? Dismiss the bill, with costs." In that case the manors were probably understood to include not only dwelling-houses, but also lands and the title thereto. (*See* 2 *Bouv. Law Dic. p.* 104, 8*th. ed.*; 2 *Black. Com.* 90.)

In *Tothill's Reports*, 39, are two cases : In one, the court ordered that a commission go forth to set out lands that laid *promiscuously*, to be liable for payment of debts. In the other, a commission was issued to set out copyhold land from free land which lay *obscured;* if the commissioners could not sever it, then to set out so much in lieu thereof.

*Speer* v. *Crawter*, (2 *Merivale*, 410,) was decided in 1817, in which case the master of the rolls held that a court of equity will not interfere between two indepen-

dent proprietors to force either to have his right determined by a commission to ascertain boundaries. He also held that the circumstance of confusion of boundaries constitutes, *per se*, no ground for the interposition of a court of equity. But it was his opinion equity would interfere if the confusion had taken place by the fault or neglect of the defendant.

In *Wilds* v. *Parkinson*, (2 *Merivale*, 507,) a commission was issued to ascertain and distinguish boundaries ; but the decree was by consent.

In *Leeds* v. *Strafford*, (4 *Vesey, Jr.* 180,) decided in 1798, the lord chancellor held that the confusion of boundaries did not happen from any negligence on the part of the plaintiff ; and said : "The boundaries are necessarily confused ; but there are, I dare say, many people who can name all the closes. The only thing that can be done at present, upon the bill, is to direct the commission." The commissioners in that case were directed to ascertain the boundaries ; set out, distinguish, divide and ascertain the same by metes and bounds.

In a note to *Strode* v. *Blackburne*, (6 *Vesey, Jr.* 227,) it is said : "The only ground upon which courts of equity grant relief, with respect to confusion of boundaries, is that the defendant, or those under whom he claims, had a duty imposed upon them to keep the *subjects* district. (*Grierson* v. *Eyre*, 9 *Vesey*, 345. *Leeds* v. *Strafford*, 4 *id.* 185. *Aston* v. *Exeter*, 5 *id.* 293.) Some equity must have been superinduced by the acts of the parties, or the court of chancery has not jurisdiction to settle the boundaries of *legal estates*. (*Wake* v. *Conyers*, 2 *Cox*, 362. *Atkyns* v. *Hatton*, 2 *Anstr.* 286. *Speer* v. *Crawter*, 2 *Meriv.* 417. *Willis* v. *Parkinson*, 1 *Swanst.* 9. *Attorney General* v. *Fullerton*, 2 *V. & B.* 265.) Unless some such foundation is laid for a commission to ascertain boundaries, it will not be issued, except by consent. (*Miller* v. *Wannington*, 1 *Jac. & Walk.* 464. *Speer* v. *Crawter*, *ubi supra*.) In *Miller*

v. *Wannington*, (*supra*,) it was held that a commission to ascertain boundaries is only to be granted when the confusion has been occasioned by the misconduct of the defendant, or those under whom he claims, and only where it is shown that they cannot be ascertained without the assistance of the court. That decision was made in 1820.

The Supreme Court of Tennessee has held that a court of chancery will not take jurisdiction to try a naked question of boundary, (*see Hale* v. *Darter*, 5 *Hump.* 79 ;) or a mere question of boundary, (*Topp* v. *Williams*, 7 *id.* 569.) There has been a similar holding in Maine, in *Haskell* v. *Allen*, (23 *Maine*, 448.)

It is laid down by Story, that an action in equity will lie to ascertain and fix boundaries of real estate, if some peculiar equity be superinduced. In other words, that to maintain such an action, there must be some equitable ground attaching to the controversy. (*See Story's Eq. Jur.* § 619, 7*th ed.*) He also says : "In the next place, a bill in equity will lie to ascertain and fix boundaries, when it will prevent a multiplicity of suits. This is an old head of equity jurisdiction; and it has been very properly applied to cases of boundaries. Indeed, in many cases of this nature, as, for instance, where the right affects a large number of persons, such as a common right in lands, or in a waste claimed by parishioners, commoners and others, where the boundaries have become confused by lapse of time, accident or mistake, the appropriate remedy to adjust such conflicting claims, and to prevent expensive and interminable litigation, seems properly to be in equity." (*Id.* § 621.)

Spence says : "The jurisdiction of adjusting controverted boundaries, *in some cases*, was incorporated in the common law." He mentions several cases which have been considered proper for the jurisdiction of the court of chancery; but none that throw any more light

Boyd *v.* Dowie.

on the subject than those to which I have referred. (1 *Spence's Chan. Eq. Jur.* 654, 655, *Phil. ed.* 1846.)

Adams asserts that a suit in equity will not lie for ascertainment of boundaries, unless it be shown that the confusion has been caused by the defendant's misconduct, or by the misconduct of those under whom he claims. (*Adams' Eq.* 534, *Am. notes.*) But this rule is too strict, according to the authorities; and it would exclude cases that come within the jurisdiction of a court of equity as defined by Story, (*supra.*)

I do not doubt that a confusion of boundaries has been shown in this case. It has been said that confusion of goods has occurred when the intermixture is such that each one's property can no longer be distinguished. (*See Hesseltine* v. *Stockwell,* 30 *Maine,* 237.) And I am of the opinion a confusion of boundaries of lands exists when by the deeds thereof, or the acts of the owners or occupants of the same, the boundaries cannot be ascertained with reasonable certainty by one party alone, or except by the judgment or opinions of men, after an examination of the deeds and the premises with a surveyor, aided perhaps by the examination of witnesses. Within this rule a confusion of boundaries has been shown in this case. But it has not happened through the fault of either party. It arises from the uncertain and confused descriptions of the lands in the deeds thereof given in 1854 by Solomon Green, under whom each party derives title to his or her portion of the land.

In locating the boundaries between the lands of the parties it will be necessary to find the top of Mount Pisgah; also where one-fourth of the land "breaks over" that mountain towards another farm; also "the summit" of that mountain, "or where the water divides;" also what "properly belongs" to one division of lands of said Green, "so as to divide equally and *justly* the lands" owned by said Green in 1854, "into four divisions, so that each division shall contain a *proper* pro-

portion of what" was then owned by said Green. "Lines are to be so run as not to encroach on lands deeded to Currie, nor those now (1854) occupied by Aaron West, and by Van Ness Halstead, and so as to include that *proportion* of Pisgah which *naturally* belongs" to one part of the lands. The condition of water on the land, or what is "well watered," in one respect, is to be ascertained; also respecting what is "compact," accommodations as to wood and water &c., must be determined.

It seems to me there are equitable grounds attaching themselves to this controversy—peculiar equities superinduced, sufficient to require the interposition of a court of equity to ascertain and fix the boundary lines between the lands of the parties to this action described in the complaint. And I am of the opinion it is probable that this action will prevent a multiplicity of suits; for I am unable to resist the conclusion that the boundaries in question cannot be found, ascertained and fixed, so as to bind the parties, or prevent interminable litigation, if the parties shall be disposed to litigate, except by a commission for that purpose.

I shall hold that a case is established, within the principle of the adjudications bearing upon it, which will justify the appointment of commissioners to ascertain and fix the boundaries in question, although the confusion thereof has not happened through any fault or misconduct of the defendants or of either of them. I place my decision upon the peculiar equities and necessities of the case—sustaining this action upon the principle of the English authorities, to which I have referred, and the rules laid down by Story, (*supra.*)

I appoint Daniel T. Arbuckle, Jonas M. Preston and Andrew Armstrong, freeholders of the county of Delaware, commissioners to find, ascertain, fix and establish the boundary lines in question by metes and bounds,

Boyd *v.* Dowie.

and to set corners and monuments to designate the corners and lines of the lands.

The commissioners will notify the parties or their attorneys of the time and place of their first meeting upon the lands, and of the days they will examine the lands and boundaries thereof. The parties and their attorneys may attend the commissioners upon the lands. The commissioners may, in their discretion, examine the parties, and also witnesses, on oath, touching any question that shall arise and be disputed before them; and they may, in their discretion, employ a surveyor to assist Mr. Arbuckle, who is a surveyor himself. They will make a report of their determinations to this court. They will annex to their report a map of the lands of the parties, and also any evidence of parties or witnesses that they shall take.

The plaintiff will pay the expenses of the commission. But which of the parties shall ultimately pay costs, or how the costs and expenses in the action shall be apportioned, are questions that are reserved.

Upon the filing of the report of the commissioners, either party may move to set it aside, or for its confirmation. And either party may give further evidence on the question of costs.

The plaintiff's attorney will draw an order and determination in conformity with this opinion, and submit it to the defendants' attorney. If they shall fail to agree upon the terms thereof, I will settle the same on its presentation to me by the plaintiff's attorney, upon at least two days' notice to the defendants' attorney.

[DELAWARE SPECIAL TERM, November, 1872. *Balcom,* Justice.]